## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **DEBORA COBB,** | : | |
| **Plaintiff** | : | **No. 3:17-CV-1629 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **ENHANCED RECOVERY** | : | **MARCH 10, 2020** |
| **COMPANY, LLC,** | : | |
| **Defendant.** | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION GRANTING
## DEFENDANT'S MOTION FOR SANCTIONS, [ECF NO. 44]

Before the Court is Defendant Enhanced Recovery Company, LLC's ("ERC") Motion for Sanctions. [ECF No. 44]. ERC moves for attorneys' fees and costs associated with defending this case because this action "was unreasonably filed and prosecuted against ERC in bad faith and for the purpose of harassing ERC into settling rather than defending this matter." [ECF No. 45 at 2]. For the reasons set forth below, ERC's Motion for Sanctions is GRANTED.

I.   <u>Background Facts</u>

Plaintiff Debora Cobb ("Plaintiff") is a citizen of Connecticut. [ECF No. 10 (Amended Complaint), ¶ 3]. Plaintiff used a personal Target credit card for shopping and household goods. *Id.* ¶ 4. That Target credit card account was the subject of debt collection efforts. *Id.*

ERC is a limited liability company organized under the laws of the state of Delaware. [ECF No. 42 at 1]. ERC is currently licensed to act as a consumer

collection agency within the state of Connecticut by the Connecticut Department of Banking. *Id.* 1-2.

On July 21, 2017, ERC sent a letter to Plaintiff which stated the following:

DEBORA COBB

Our records indicate that your balance with TD Bank USA, N.A./ Target Credit Card remains unpaid; therefore your account has been placed with ERC for collection efforts.

Upon receipt and clearance of $1,267.50, your account will be closed and collection efforts will cease.

Unless you dispute the validity of the debt, or any portion thereof, within thirty (30) days after your receipt of this notice, the debt will be assumed to be valid by us.

[ECF No. 10 (Amended Complaint), Exhibit 1].  The top left corner of the front page of the letter bore a logo comprising the initials "ERC." *Id.*  The top right corner of the front page identified the "Creditor" as "TD Bank USA, N.A./ Target Credit Card." *Id.*  The letter included the language "[t]his is an attempt to collect a debt. Any information obtained will be used for that purpose." *Id.*  The letter stated, "view statements, pay your balance, and manage your account online at payerc.com." *Id.* (obscured); [Dkt. 35-1, ¶ 26].  The letter also listed a toll-free phone number and invited the debtor to "[s]end correspondence to ERC, P. O. Box 57610, Jacksonville, FL 32241." *Id.*  The reverse of the letter stated "[o]ur Corporate Address is: ERC 8014 Bayberry Road Jacksonville, FL 32256." *Id.*

On August 1, 2017, Plaintiff called ERC.  [ECF No. 35-1, ¶ 30].  An automated message played, which stated "thank you for calling ERC." *Id.*  When ERC's representative answered the phone, he said, in part: "Good morning.  Thank you

for calling ERC.  My name is Irving Anderson speaking with you on a recorded line. Who do I have the pleasure of speaking with today?"  *Id.* ¶ 31.

Rather than obtaining information Plaintiff may have considered missing from ERC's collection letter from Mr. Anderson, Plaintiff decided to file a Complaint alleging same in this Court on September 28, 2017.  [ECF No. 1].  The Complaint alleged as its basis for relief that ERC had violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, because ERC's "initial letter did not disclose defendant's true name anywhere, but instead used ERC throughout, in violation of 15 U.S.C. §1692e(14)."  [ECF No. 1 ¶ 9].  Plaintiff had standing, she claimed, because "defendant directed its collection activities to her, and she was harmed by its violation of her interest in obtaining information to which she [wa]s statutorily entitled."  [ECF No. 1 ¶ 10].  The Complaint asked the Court to (i) "[a]ward plaintiff such damages as are permitted by law including $1,000 statutory damages," (ii) "[a]ward the plaintiff costs of suit and a reasonable attorney's fee," and (iii) "[a]ward such other and further relief as law or equity may provide."  [ECF No. 1 at 2].

On November 7, 2017, ERC's Director of Legal Richard Landoll sent Plaintiff's counsel information from the National Multistate Licensing System (NMLS)—the system of record for the Connecticut Department of Banking— demonstrating that "ERC" was a registered trade name under which ERC was licensed to act as a consumer debt collection agency in Connecticut.  [ECF Nos. 42 at 3; 45 at 5-6; 46-2 ¶ 6, Exhibits A, B].  He also noted that "[i]f this matter is not voluntarily dismissed, ERC will litigate and will entertain filing for sanctions due to

3

the continuance of the matter knowing that your allegations lack merit."  [ECF No. 46-2, Exhibit A].

On November 28, 2017, ERC Answered the Complaint, asserting, *inter alia*, the following affirmative defenses:

- **Fourth Affirmative Defense:** "Plaintiff's claims against ERC must be dismissed because ERC used an acronym for Enhanced Recovery Company, LLC, in accordance with regulatory guidance concerning the FDCPA."

- **Fifth Affirmative Defense:** "Plaintiff's claims against ERC must be dismissed because ERC used its common trade name in the letter in accordance with regulatory guidance concerning the FDCPA."

- **Sixth Affirmative Defense:** "Plaintiff's claims against ERC must be dismissed because ERC used its common trade name in the letter, which appears on the license issued to it to provide collection services in the state of Connecticut."

[ECF No. 11 at 5-6].

On the same day, after ERC filed its Answer, Plaintiff's counsel sent ERC an email offering to settle the case for $4,500 and describing the instant matter as a "fee-shifting case."  [ECF No. 46-1 ¶ 13].

The next day, on November 29, 2017, Plaintiff filed an Amended Complaint, this time asserting that ERC's "initial letter did not disclose defendant's true name anywhere, but instead used ERC throughout, including on the reverse, in violation of the plain language of 15 U.S.C. §1692e(14)."  [ECF No. 10 ¶ 10].  The Amended Complaint added allegations that ERC (i) "effectively concealed its true name by the use of its obscure initials," (ii) "ha[d] previously used its full name in collection letters, including on the reverse," (iii) used its full name in banking activities and with tax authorities, and (iv) "conceals its true name only from consumer debtors." *Id.* ¶¶ 16, 17, 18, 20.  The Amended Complaint alleged that ERC, on and after

4

December 12, 2016, had started including both "ERC" and "Enhanced Recovery Company, LLC" in its collection letters, but had failed to do so in ERC's letter to Plaintiff.  *Id.* ¶¶ 22, 23.  The Amended Complaint also added a new allegation that ERC had "not filed a trade name certificate with any town clerk in Connecticut as required by Conn. Gen. Stat. § 35-1."  *Id.* ¶ 14.  The Amended Complaint repeated the standing paragraph from the Original Complaint; Plaintiff's alleged harm was ERC's "violation of [Plaintiff's] interest in obtaining information to which she [wa]s statutorily entitled."  *Id.* ¶ 5.  Finally, the Amended Complaint repeated the prayer for damages from the Original Complaint, asking the Court to award statutory damages of $1,000, attorneys' fees and costs, and other relief as the Court saw fit to award.  *Id.* at 3-4.

On December 4, 2017, Plaintiff's counsel sent ERC an email concerning the Parties' Rule 26(f) Report, asking ERC to stipulate as a material fact that "Defendant has not filed a trade name certificate with any town clerk in Connecticut as required by Conn. Gen. Stat. § 35-1" and noting that since ERC had changed its collection letters to include its full name and "ERC," "early settlement should be advisable." [ECF No. 46-1 ¶¶ 14, 15].

On December 12, 2017, Plaintiff's counsel sent a letter to ERC, stating in part "Settlement offer for $5,000 (your client has changed its letters to be compliant, so let's get rid of this before year end)."  *Id.* ¶ 16.

On December 20, 2017, ERC countered Plaintiff's offer by offering $3,000 to settle the case; Plaintiff refused, and Plaintiff's counsel again demanded $5,000 to settle the case.  *Id.* ¶ 17; [ECF No. 49-1 at 4].

5

On January 10, 2018, ERC sent Plaintiff's counsel a copy of the opinion in *Hsu v. Enhanced Recovery Company, LLC*, No. 1:17-cv-128-RP, 2018 WL 315758 (W.D. Tex. Jan. 5, 2018), in which District Judge Robert Pitman found that "ERC" is a true name for Enhanced Recovery Company, LLC under the FDCPA.  ERC also provided Plaintiff's counsel with a link to the Connecticut Consumer Collection Agency licensing records maintained by the Nationwide Multistate Licensing System and Registry ("NLMS"), showing that "ERC" was a licensed trade named for Enhanced Recovery Company, LLC.[1]  [ECF No. 46-1 ¶ 18].

On January 11, 2018, the Court referred the case to Magistrate Judge Robert A. Richardson for a settlement conference, which was scheduled for February 20, 2018, then rescheduled for March 7, 2018.  [ECF Nos. 19, 23-25].

On January 31, 2019, Plaintiff's counsel sent ERC an email stating that "[t]he conference order mandates that whoever comes from Enhanced have full authority to settle up to plaintiff's last demand.  Maybe we could settle without the expense of travel for you and your client, which will probably exceed our current demand…….which can only increase."  [ECF No. 46-1 ¶ 19].

On February 21, 2018, Plaintiff's counsel sent ERC an email indicating that Plaintiff' settlement demand was still $5,000, but that it was likely to increase when Plaintiff's counsel had to draft the settlement memorandum and attend the settlement conference.  *Id.* ¶ 20.

---

[1] *See* https://www.nmlsconsumeraccess.org/entitydetails.aspx/COMPANY/953724, showing same, last accessed by the Court on November 21, 2019.

On February 28, 2019, ERC received an undated Notice of Deposition for Richard Landoll, ERC's representative to the settlement conference, who would be flying to Hartford from Jacksonville, Florida, for the day following the settlement conference.  *Id.* ¶¶ 21, 22.[2]

On March 6, 2018, the day before the settlement conference, Plaintiff lowered the settlement demand to $4,000.  When ERC declined, Plaintiff's counsel responded "Please read page 2 of the settlement conference order.  You are supposed to be there WITH AUTHORITY to pay the $5k[.]  Let's do it now."  *Id.* ¶ 23 (emphasis in original).

The March 7, 2018 settlement conference was unsuccessful.  [ECF No. 27].

On March 8, 2018, Plaintiff increased the settlement demand to $5,000, and asked for ERC's consent to file an Amended Complaint with a new claim based on a purported oral misrepresentation by one of ERC's representatives when discussing ERC's collection action with Plaintiff.[3]  [ECF Nos. 46-1 ¶ 24; 45 at 11]. Plaintiff also made an alternative settlement demand; payment to Plaintiff of $1,000 with a follow-on application by Plaintiff to the Court for attorneys' fees and costs. [ECF No. 46-1 ¶ 25].

On April 6, 2018, ERC sent Plaintiff a Certification from Carmine Costa, Director of the Consumer Credit Division of the State of Connecticut Department of Banking, certifying that the NLMS is the system of record for the Connecticut Department of Banking, and that ERC was licensed to use the trade name ERC

---

[2] It is unclear from the record whether Mr. Landoll was ever deposed.
[3] It is unclear whether ERC consented to Plaintiff filing a Second Amended Complaint, but none was ever filed.

since August 2015.  *Id.* ¶ 26.  In the email attaching the certification, ERC's counsel informed Plaintiff's counsel that ERC intended to file for summary judgment and would "seek to recover its fees if [Plaintiff] would not voluntarily dismiss this action."  *Id.*

On April 9, 2018, Plaintiff's counsel again demanded $5,000 to settle the case and remarked that she did not "understand why [ERC] continues to fight this when it has long since changed its mailing."  *Id.* ¶ 27.

On April 14, 2018, Plaintiff's counsel demanded $1,000 plus costs and fees to settle the case.  *Id.* ¶ 28.

On May 9, 2018, Plaintiff's counsel demanded $1,001 plus costs and fees to settle the case.  *Id.* ¶ 29.

On May 16, 2018, Plaintiff's counsel demanded $1,000 plus costs and fees to settle the case.  *Id.* ¶ 30.

On June 12, 2019, ERC filed its Motion for Summary Judgment, arguing that the caselaw was clear that use of a trade name that is licensed in the state where collection activity occurred meant liability could not attach pursuant to 15 U.S.C. §1692e(14) and that Plaintiff's case was, therefore, meritless.  [ECF Nos. 29, 30, 31].

On June 29, 2018, Plaintiff's counsel emailed ERC's counsel asking for a two-week extension to respond to ERC's Motion for Summary Judgment, and, after ERC's counsel consented, Plaintiff's counsel demanded $1,000 plus costs and fees to settle the case.  [ECF No. 46-1 ¶ 31].

On July 5, 2018, Plaintiff filed her Opposition to ERC's Motion for Summary Judgment and demanded that ERC's counsel confirm with ERC's new CEO whether he had any interest in settling. *Id.* ¶ 32.

In a July 23, 2018 filing in opposition to ERC's Motion for Judicial Notice of certain documents, Plaintiff once again referred to the instant matter as a "fee-shifting case." [ECF No. 38 at 5].

On August 3, 2018, Plaintiff's counsel demanded $1,000 plus costs and fees to settle the case. *Id.* ¶ 33.

II.    **The Court's March 11, 2019 Memorandum of Decision GRANTING ERC's Motion for Summary Judgment, [ECF No. 42]**

The Court's Memorandum of Decision granting ERC's Motion for Summary Judgment first set forth the background facts concerning ERC's collection action against Plaintiff Debora Cobb, which are recounted above. [ECF No. 42 at 1-3]. The Memorandum also noted that ERC had been "licensed to act as a consumer collection agency within Connecticut under the trade name ERC, as indicated by the National Multistate Licensing Service," was licensed as a consumer collection agency in Florida under the trade name "ERC," maintained a federal registration with the U.S. Patent and Trademark Office ("PTO") for the service mark "ERC," and was registered with the State of Delaware under the name "ERC." *Id.* at 3. Finally, the Memorandum's background section noted that "the Nationwide Multistate Licensing System was authorized pursuant to Connecticut statute to process applications for consumer collection agency licenses and maintain records of such licenses," and that "[s]earching 'ERC' on the NMLS website return[ed] a single match: Enhanced Recovery Company, LLC," which indicated that "the corporation

is licensed in Connecticut and uses the trade name 'ERC' in Connecticut."  *Id.* at 3-4.

The Memorandum of Decision then set out the proper summary judgment legal standard, and the legal standard for the "true name" section of the FDCPA:

> The FDCPA prohibits debt collectors from employing false, deceptive, or misleading practices.  One category of practices is [t]he use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.  Although the F[D]CPA does not say what a 'true name' is, its import is straightforward: a debt collector may not lie about his institutional affiliation.  The Federal Trade Commission states that the 'true name' provision allows a debt collector to use its full business name, the name under which it usually transacts business, or a commonly— used acronym[,] as long as it consistently uses the same name when dealing with a particular consumer.

*Id.* at 4-6 (quotations and citations omitted).  The Court then noted that it would use the commonly accepted "least sophisticated consumer" standard, under which "collection notices can be deceptive if they are open to more than one reasonable interpretation, at least one of which is inaccurate," but also noted that "[c]ourts should apply the standard in a manner that protects debt collectors against liability for unreasonable misinterpretations of collection notices."  *Id.* at 6 (quotations and citations omitted).

In the analysis section, the Court chastised Plaintiff for "attempt[ing] to stretch the 'least sophisticated consumer' standard to undermine established precedent," noting that "[c]ase law is clear on this point – if an entity is licensed to do business under a trade name, that name is the entity's 'true name' for the purpose of the FDCPA."  *Id.* at 7 (citing cases in this District, and in and out of this Circuit).  The Court held that "[t]here is no genuine issue of material fact as to

whether Enhanced used its "true name" in its communications with Ms. Cobb for the purposes of § 1692e(14)" because ERC "ha[d] been licensed in Connecticut under the name 'ERC' since 2015, two years before the July 21, 2017 Letter" and because ERC was registered in Florida and Delaware under the name "ERC," which proved that "ERC" was a trade name under which Enhanced Recovery Company, LLC was "permitted to transact business."  *Id.* at 8.

Next the Court found that Plaintiff alleged "no instances of misleading conduct or misrepresentations," and found that Plaintiff's cited cases were "easily distinguishable from the present case," calling them "wholly inapposite," "not persuasive," and "bolster[ing] Defendant's argument, not Plaintiff's."  *Id.* at 9-10 (discussing Plaintiff's cited cases including *Velez v. Healthcare Revenue Recovery Group, LLC*, No. 1:16-cv-377, 2017 WL 1476144 (M.D.N.C. Apr. 24, 2017), which held that use of a fictitious "initialism" satisfied § 1692e(14) when defendant registered the initialism in the state of its headquarters, not where it conducted collection activities; the Court held that Plaintiff's claim in the instant matter was "even weaker" than in *Velez* because ERC was not only registered in Florida and Delaware, but also in Connecticut where the collection activity occurred).

The Court held that even the "least sophisticated consumer" would know, upon receiving ERC's collection letter, that it had not come from "Energy Regulatory Commission", "Evangelical Reformed Church," or "Eastern Red Cedar," which were "all interpretations suggested by Plaintiff."  *Id.* at 10-11.  The Court called these "bizarre, idiosyncratic interpretations" of ERC's collection letter

"that this Court must guard against."  *Id.* at 11 (quoting *Easterling v. Collecto, Inc.*, 692 F.3d 229, 233-34 (2d Cir. 2012)).

> Summing up, the Court held that:

> The information ERC provided to Ms. Cobb fully enabled the least sophisticated consumer to determine whether the debt collection was legitimate or fraudulent.  The letter contained a website using the initials 'ERC,' a corporate address bearing the name 'ERC,' and a telephone number that led to a representative answering the phone and identifying the company as 'ERC.'  Contrary to Plaintiff's assertions, the letter did not require a Connecticut consumer to 'chase around in Delaware, Florida, or the U.S. Patent Office.' [Dkt. 35, at 11]. All of the information was available on the Connecticut Department of Banking website, which was the system set up by the State of Connecticut to allow the public to determine the identity of legitimate debt collectors. . . . [T]he Court follows the guidance of the FTC and precedent in this District in stating that a trade name under which an entity is licensed is that entity's 'true name' for the purpose of §1692e(14). . . . The FDCPA protects consumers from unscrupulous debt collectors; the statute does not create an avenue to harass legitimate creditors with litigation through superficial interpretation of its provisions.

[ECF No. 42 at 11-12].  The Court then granted ERC's Motion for Summary Judgment and directed the Clerk to close the case.  *Id.* at 12.  Judgment entered for ERC that same day, March 11, 2019.  [ECF No. 43].

One month later, on April 10, 2019, ERC filed the instant Motion for Sanctions, asking the Court to award it its attorneys' fees and costs to litigate this action, because, according to ERC, it "was unreasonably filed and prosecuted against ERC in bad faith and for the purpose of harassing ERC into settling rather than defending this matter."  [ECF No. 45 at 2].

III.    <u>Legal Standard</u>

Under its inherent power, "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991).  This "serv[es] the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy."  *Id.* at 46.  "A court may also sanction a litigant pursuant to its inherent authority 'if there is clear evidence that the [litigant's] conduct' was '(1) entirely without color and (2) motivated by improper purposes.'"  *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 56 (2d Cir. 2018) (quoting *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009)).

Section 1692k(a)(3) of the FDCPA permits a court to sanction a litigant for bringing suit under the Act "in bad faith and for the purpose of harassment."  15 U.S.C. § 1692k(a)(3).  The Supreme Court recognized this provision codifies the court's inherent powers but does not limit or disturb them.  *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 382-84 (2013).  The Second Circuit recently affirmed an award of sanctions against a litigant premised on sections 1692k(a)(3) and the court's inherent authority. *See Huebner*, 897 F.3d at 56-57.

"Congress enacted the FDCPA 'with the aim of eliminating abusive practices in the debt collection industry, and also sought to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged.'"  *Suquilanda v. Cohen & Slamowitz, LLP*, No. 10 Civ. 5868 (PKC), 2011 U.S. Dist. LEXIS 102727, at *9 (S.D.N.Y. Sept. 8, 2011) (quoting *Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 89 (2d Cir. 2008)).  "The FDCPA establishes a general prohibition against the use of 'false, deceptive, or misleading

representation or means in connection with the collection of any debt.'" *Id.* (quoting 15 U.S.C. § 1692e).

The applicable statute states that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . . The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization . . . ." 15 U.S.C. § 1692e(14).  "Although the FCCPA does not say what a 'true name' is, its import is straightforward: a debt collector may not lie about his institutional affiliation."  [ECF No. 42 at 5 (citing cases)]; *see also Mahan v. Retrieval-Masters Credit Bureau, Inc.*, 777 F. Supp. 2d 1293, 1299 (S.D. Ala. 2011) ("Section 1692e(14), like the other provisions of § 1692e, only prohibits conduct that is false, deceptive, or misleading.") (quoting *Anthes v. Transworld Sys., Inc.*, 765 F. Supp. 162, 172 (D. Del. 1991)).

## IV.    The Parties' Arguments

ERC makes four principal arguments in support of its Motion for Sanctions:

### A.   Plaintiff Should Have Known her Case was Meritless from the Beginning of the Case

ERC argues that "[b]ad faith and harassment is shown where simple legal research" or "a reasonable investigation" would reveal lack of a viable claim under the FDCPA.  [ECF No. 45 at 5 (citing cases)].  Shortly after Plaintiff filed her Complaint, ERC argues, ERC's "internal personnel" informed Plaintiff that "ERC" was a registered trade name in Connecticut, which meant liability under the FDCPA could not attach, and ERC reiterated this in its Answer to the Complaint, yet Plaintiff

doubled down, filing an Amended Complaint the next day reasserting the same claim that ERC violated the FDCPA by using the acronym "ERC" in its collection letter to Plaintiff. *Id.* at 5-6, 8. This shows that there was "no basis" for Plaintiff filing her Complaint with its "ill-founded" claim, and her continued prosecution of the case in the face of ERC's evidence was a mere "attempt to extract a settlement payment from ERC." *Id.* at 6.

ERC also argues that Plaintiff had to know that her claim that ERC was permitted to use only its full corporate name in its collection letter was incorrect because Plaintiff's counsel's identical argument was rejected by this Court almost 30 years ago in *Kizer v. American Credit & Collection*, No. B-90-78 (TFGD), 1990 U.S. Dist. LEXIS 20827 (D. Conn. Dec. 17, 1990)[4] (holding that "a debt collector's true name is the name under which the debt collector is licensed to do business" and citing FTC, Statements of General Policy or Interpretation, Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50107 (Dec. 13, 1988), which stated that "[a] debt collector may use a name that does not misrepresent the identity or deceive the consumer. Thus, a collector may use its full business name, the name under which it usually transacts business, or a commonly used acronym"), *approved & adopted*, 1991 U.S. Dist. LEXIS 21612 (D. Conn. Jan. 22, 1991). [ECF No. 45 at 6-7]. ERC argues that while neither *Kizer* nor the FTC guidance are binding on the Court, they are consistent with "intervening case law decided under section 1692e(14) of the [FDCPA], on which [Plaintiff] based her

---

[4] The claim in *Kizer* was identical to the claim here, that Defendant violated the FDCPA by using a trade name registered in Connecticut, rather than its official corporate name. *Id.* at *16.

claim against ERC."   [ECF No. 45 at 7 (citing post-2000 cases holding debt collector's true name includes trade name under which collector is licensed to do business)].

This well-established caselaw, ERC argues, means that Plaintiff knew upon filing the Complaint that her claim that ERC violated the FDCPA by not using its full corporate name was meritless, and "there is no indication [Plaintiff], or her counsel, made any effort to investigate whether" ERC was registered to use its trade name "ERC" in collection efforts. *Id.* at 8.

Moreover, shortly after that time, ERC provided Plaintiff with a copy of *Hsu v. Enhanced Recovery Co.*, No. 1:17-cv-128-RP, 2018 WL 315758, at *4-5 (W.D. Tex. Jan. 5, 2018), which held that ERC's use of its trade name "ERC" in collection efforts did not violate 15 U.S.C. § 1692e(14), even though ERC had failed to comply with a Texas state law, which was the same claim Plaintiff made here. [ECF No. 45 at 8].  Plaintiff should have dismissed her claim after reviewing *Hsu*, ERC argues, as the claim there was identical to Plaintiff's, yet she did not; thus, Plaintiff's "continued prosecution can only be viewed as bad faith and harassment."  *Id.* at 9. And, ERC argues, the Court, in its Grant of Summary Judgment, noted that Plaintiff "was unable to cite a single case in which a court recognized a claim under section 1692e(14) of the [FDCPA] for the use of a trade name that the collector has registered in the applicable jurisdiction." [ECF No. 45 at 7 (citing ECF No. 42 at 9)]. Rather, the Court found Plaintiff "relied on easily distinguished case law in an attempt to undermine long-established precedent on this point." *Id.* at 7.  In other words, there was no basis for Plaintiff's claims.

Plaintiff responds that "losing a case is not evidence that plaintiff brought this case in bad faith."  [ECF No. 47 at 1 (citing *Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 97 (2d Cir. 2010)].  Plaintiff's Complaint properly alleged, she claims, that "Defendant's use of only an unrecognizable initialism violated 15 U.S.C. § 1692e," which reads, according to Plaintiff, "the following conduct is a violation of this section: . . . (14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization." Additional facts supporting her claim include that (1) "Defendant did not, and could not, prove that "ERC" is a true name or a commonly-used acronym," or (2) "a Connecticut-registered fictitious name (Conn. Gen. Stat. § 35-1)," or that (3) "the least sophisticated consumer would recognize it," or that (4) "the Connecticut Banking Department had actually approved its use of only the initialism."  *Id.* at 2. Thus, even though the Court granted ERC summary judgment, "Plaintiff had 'colorable, though unsuccessful, arguments.'"  *Id.* at 2-3.

### B. Continued Prosecution of this Case was a Bad Faith Means to Extract a Settlement Payment from ERC

ERC argues that Plaintiff's numerous suggestions to settle the case, her rejection of ERC's information regarding ERC's license with Connecticut, her rejection of ERC's settlement offer, her attempt "to leverage a settlement payment from ERC" by claiming the price would go up after the settlement conference, her improper noticing of a deposition of ERC's Chief of Legal, her response to the Connecticut Department of Banking certification that ERC was registered as of August 2015 that she did not understand "why [ERC] continues to fight this when

it has long since changed its mailing," and her continued communications regarding settlement even during summary judgment briefing "despite ERC's continued refusals reflect that [Plaintiff] was seeking only to recover a settlement payment from ERC notwithstanding the invalidity of her claims and her lack of any alleged harm caused by ERC's letter."  [ECF No. 45 at 10-12].

Plaintiff responds that "[s]ettlement offers are encouraged by public policy" and argues that her "settlement initiatives suggest that plaintiff aimed at the twin goals of judicial economy and implementation of Fed. R. Civ. P. 1 to secure the speedy and inexpensive determination of the proceeding."  [ECF No. 47 at 13]. Plaintiff also faults ERC for not settling, noting that "plaintiff sought only the statutory damages of $1,000," and "[p]laintiff should not be sanctioned for defendant's persistent refusal to settle, which would have stanched the flow of fees on both sides at significantly less than $40,000."  *Id.*  Moreover, Plaintiff argues, by refusing to settle, ERC's "pursuit of a judgment herein was nothing more than pursuit of an uncompensable advisory opinion."  *Id.* at 14.

## C. The Court Should Sanction Plaintiff's Counsel because She Unreasonably Multiplied the Proceedings in this Case

ERC argues that Plaintiff's counsel "unreasonably multiplied the proceedings in this matter" not only by failing to withdraw Plaintiff's claims, but also by (1) amending the complaint to add a state claim under Conn. Gen. Stat. § 35-1, but later disclaiming that such a claim was ever made, which required ERC to devote one-third of its summary judgment briefing to this topic and increased other costs, (2) refusing to concede that the Connecticut Department of Banking had licensed ERC to use the trade name "ERC" in its consumer debt collection efforts,

despite ERC providing overwhelming evidence to Plaintiff, which increased ERC's costs, (3) frivolously objecting to ERC's declarations of its officer's and others regarding its licensing in Connecticut as hearsay, thereby necessitating further briefing on the topic, and (4) changing course and arguing that whether ERC was registered in Connecticut was irrelevant, which made her earlier arguments that ERC was unlicensed "meaningless and unnecessary."  [ECF No. 45 at 13-18].

Plaintiff responds that "there [was not] any 'multiplication' herein."  [ECF No. 47 at 6].  This is because "[t]he records shows that these simple proceedings consisted of a complaint and answer, an amended complaint and answer, a planning report, a settlement conference requested by the parties (unsuccessful), and defendant's vigorously opposed motion for summary judgment.  There were no depositions or interlocutory motions [and] [n]either party presented a discovery dispute to the Court."  *Id.*

### D. ERC has a Right to Attorneys' Fees Required to Prove ERC's Licensing Status Given Plaintiff's Refusal to Admit the Obvious

ERC argues that in discovery it served Rule 36 Requests for Admissions requesting that Plaintiff admit the facts that ERC was licensed to use the trade name "ERC" in Connecticut and Florida and had registered the service mark "ERC" with the PTO, but Plaintiff denied these facts, which are "now established."  *Id.* at 19-20.  These denials were "unreasonable" and "likely calculated to cause ERC to incur additional costs."  *Id.* at 20.  Because of this, ERC argues, the Court "*must*" award ERC its attorneys' fees for the cost of making these discovery requests under Federal Rule of Civil Procedure 37(c)(2).  *Id.* (citing Fed. R. Civ. P. 37(c)(2)).

Plaintiff responds that (1) "defendant did not ask plaintiff anything about the NLMS website," (2) "did not ask plaintiff to admit the genuineness of any document," (3) "did not ask for admission of . . . whether the Banking Department had approved the use of "ERC" without also using its full legal name," and (4) "did not submit a business records affidavit from the Banking Department that it had reviewed and approved the fictitious name." *Id.* at 20-21.  Because of this, Plaintiff had "a reasonable ground to believe it might prevail on the matter" and therefor sanctions should not be awarded.  *Id.* at 21.

V.   <u>Analysis</u>

The Court finds that ERC should be awarded its attorney's fees for defending this action pursuant to the court's inherent power as set forth in *Chambers* because the plaintiff's lawsuit "was meritless and brought for improper purposes," *Huebner*, 897 F.3d at 57, and pursuant to Section 1692k(a)(3) of the FDCPA, which permits a court to sanction a litigant for bringing suit under the Act "in bad faith and for the purpose of harassment."  15 U.S.C. § 1692k(a)(3).

First, it is clear that Plaintiff has at best misconstrued and at worst intentionally misinterpreted 15 U.S.C. § 1692e(14).  Plaintiff claims that this statute reads as follows: "15 U.S.C. § 1692e: 'the following conduct is a violation of this section: . . . (14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.'" [ECF No. 47 at 2].  That is not what 15 U.S.C. § 1692e(14) says.

Read properly, in its entirety, 15 U.S.C. § 1692e(14) states:

U.S. Code, Title 15. Commerce and Trade, Chapter 41. Consumer Credit Protection, Subchapter V. Debt collection Practices, Section 1692e. False or Misleading Representations:

A debt collector may not use any *false, deceptive, or misleading representation or means in connection with the collection of any debt*. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

15 U.S.C. § 1692e(14) (emphasis added). Plaintiff's interpretation of 15 U.S.C. § 1692e(14) reads out the highlighted, and most important part of the statute, which makes unlawful "any false, deceptive, or misleading representation or means in connection with the collection of any debt." That this is the key part of the statute is emphasized by the statute's title, "False or Misleading Representations." According to Plaintiff, no false, deceptive, or misleading conduct need be alleged or proved; all that matters is whether the debt collector has used its "true name" in a debt collection letter. That is not what the plain text of the statute says. And, that is not what Congress intended in passing the FDCPA. "Congress enacted the FDCPA 'with the aim of eliminating abusive practices in the debt collection industry, . . . [by] establish[ing] a general prohibition against the use of 'false, deceptive, or misleading representation or means in connection with the collection of any debt.'" *Suquilanda*, 2011 U.S. Dist. LEXIS 102727, at *9; *see also Mahan*, 777 F. Supp. 2d at 1299 ("Section 1692e(14), like the other provisions of § 1692e, *only prohibits conduct that is false, deceptive, or misleading*.") (emphasis added). Here, the only harm Plaintiff alleges is that ERC violated "her interest in obtaining information to which she [wa]s statutorily entitled." [ECF Nos. 1 ¶ 10, 10 ¶5]. That is not false, deceptive, or misleading, and thus, Plaintiff's claim was not

"colorable," it was baseless. *See Islam v. Credit Control, LLC*, No. 16-cv-6883, 2017 U.S. Dist. LEXIS 99571, at *10 (E.D.N.Y. June 27, 2017) ("What is the harm complained of here? Confusion; a belief that the debt may have been sold or assigned, neither of which, assuming their truth, smacks of abuse, deception or harassment. . . . [T]he FDCPA has not been violated").  The statute enumerates a non-exhaustive list of 16 items that might be deceptive, 15 U.S.C. §§ 1692e(1)-(16); ERC using that acronym in debt collection letters when it is registered to do so is not prohibited by law.

Here, Plaintiff does not claim nor does the record reflect that she was in fact misled or deceived.  She made no inquiry of the defendant's representative when speaking on the telephone, does not profess to have been unable to identify Defendant using the other identifying information provided, nor does she allege she consulted any state consumer protection registry.  The record indicates that had she, or her counsel, done so it would have been patently clear that defendant had not engaged in any deceptive or misleading practice and had used its permissible trade name.  None of the entities to which Defendant's trade name could reasonably be mistaken were for a debt collector.  Even if they could be so mistaken, Defendant could do nothing more than it did by registering the trade name to avoid any confusion.  By preceding the examples of misleading and deceptive practices with the phrase "[w]ithout limiting the general application of the foregoing," Congress made clear the intent was to prohibit use of a name other than one's own for the purpose or in a manner which had the effect of misleading or deceiving a consumer and not to prohibit the use of a registered trade name,

22

particularly together with other identifying information such that a consumer was not in fact and could not reasonably be misled or deceived.  The law is designed to protect the reasonably prudent consumer and not the intentionally or recklessly ignorant consumer.

Moreover, "the Federal Trade Commission's position is that a debt collector's 'true name' encompasses not only its formal corporate name, but also the name under which it usually transacts business.  Numerous federal courts have similarly determined that trade names comport with the FDCPA's 'true name' requirement, such that a debt collector does not violate § 1692e(14) by using the registered or licensed name under which it transacts business – rather than its formal corporate name – in debt collection communications."  *Mahan*, 777 F. Supp. 2d at 1299 (citing *Orenbuch v. N. Shore Health Sys., Inc.*, 250 F. Supp. 2d 145, 151-52 (E.D.N.Y. 2003) and *Boyko v. Am. Int'l Grp., Inc.*, No. 08-2214 (RBK/JS), 2009 U.S. Dist. LEXIS 119339, at *7 (D.N.J. Dec. 23, 2009)).  As *Mahan* explained, "the cases in which a violation of § 1692e(14) have been found typically involve a debt collector misrepresenting its identity, such as by purporting to be the creditor when it is not, purporting to be a government agency when it is not, or purporting to be distinct from the creditor when it is not."  *Id.* at 1300 (citing cases).  "[15 U.S.C.] § 1692e(14) at its core clearly prohibits the use of a name that is neither the collector's actual corporate name nor its trade name, licensed or otherwise."  *Boyko*, 2009 WL 5194431, at *6; *Orenbuch*, 250 F. Supp. 2d at 151-52 ("The defendants correctly argue that there is nothing misleading about a debt collector (RCRS) using the name by which it is known to the public where, as here, that name

is a registered trade name with the New York Department of State. ... [B]ecause RCRS letters refer to RCRS's true name, it does not constitute a false deceptive or misleading representation.").

This is important because it highlights that this case should never have been brought in the first place.  A modicum of research would have revealed that this case was baseless, and as noted in the Court's ruling on summary judgment, "Plaintiff allege[d] no instances of misleading conduct or misrepresentations" and "fail[ed] to cite a single case in which a court allowed a § 1692e(14) claim to proceed against an entity for use of an initialism that the entity uses as a registered trade name in that jurisdiction."  [ECF No. 42 at 9].  The Court also noted that Plaintiff's cited cases were "easily distinguishable" from the present case, *id.*, making Plaintiff's position even more baseless, not "colorable, though unsuccessful," as Plaintiff suggests.

Moreover, once Plaintiff was alerted to the baselessness of her position by ERC's communication and the filing of its Answer early in this case, she continued to press on, doubling down by filing an Amended Complaint repeating the same claim, engaging in an unsuccessful settlement conference, and vigorously and unsuccessfully opposing ERC's Motion for Summary Judgment.  Everything after ERC notified Plaintiff that her claim was baseless was unnecessary and ERC is entitled to attorneys' fees from that point forward.

Plaintiff argues that "losing a case is not evidence that plaintiff brought this case in bad faith, citing *Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 97 (2d Cir. 2010).  But that case was a case of first impression, whereas liability under 15

U.S.C. § 1692e(14) has been litigated extensively throughout the federal courts, and not one court to date has ruled in a manner supportive of Plaintiff's claim.[5]  Indeed, as ERC points out in its Motion for Sanctions, 30 years ago Plaintiff's counsel argued in this Court that the use of a trade name, even if it is registered, violated the FDCPA.  [ECF No. 45 at 6].   But this Court rejected that argument in *Kizer*, 1990 WL 317475, instead holding that whatever name is included on a collector's consumer collection agency license in Connecticut is a true name under the FDCPA.  *Id.* at *6.  A fellow district court even ruled on a claim against ERC identical to Plaintiff's, finding it baseless, *during this litigation*, and ERC provided that opinion to Plaintiff, but Plaintiff soldiered on in the face of overwhelming evidence that her claim was baseless.  [ECF No. 45 at 8 (citing and discussing *Hsu v. Enhanced Recovery Co., LLC*, 2018 WL 315758)].

In sum, Plaintiff's claim in this matter that ERC violated 15 U.S.C. § 1692e(14) simply by using "ERC" as its company identifier was baseless, which was pointed out to Plaintiff repeatedly by ERC throughout the litigation process.

Plaintiff's baseless claim, when combined with Plaintiff's other actions in this matter, lead the Court to the conclusion that sanctions must be imposed.

---

[5] *See Velez v. Healthcare Revenue Recovery Grp., LLC*, No. 1:16-cv-377, 2017 WL 1476144 (M.D.N.C. Apr. 24, 2017) (holding that trade name registered in collector's home state was a true name under the Act); *Bieder v. Retrieval Masters Creditors Bureau, Inc.*, 146 F. Supp. 3d 465 (E.D.N.Y. 2015) (holding name under which collector was licensed in New York City to be true name under the Act); *Hsu*, 2018 WL 315758, at *4-5 (finding that if ERC was registered as a fictitious name in the state to which the letter was sent or to which it directed the consumer to send a response, then it is a true name under the Act, notwithstanding that Defendant may not have complied with the unrelated state law).

Those other actions include Plaintiff's insistence, by the Court's count not fewer than 15 times, that Defendant pay damages and mounting legal fees to settle the case despite the fact that Defendant presented factual and legal authority soundly proving it was baseless and Plaintiff's counsel failed to present and facts or law to refute it.  Bringing a case under the mistaken belief that it has merit is one thing.  Maintaining a case after learning it is does not have merit is another. Demanding increasing legal fees for a known unmeritorious case is quite another.

Plaintiff also referred to this case as a "fee-shifting case," undoubtedly referring to the fact that the FDCPA "entitles plaintiffs' attorneys to recover their reasonable fees and costs in any action in which they are successful in imposing liability, . . . [b]ut . . . only permits defendants to recover their attorneys' fees upon a showing that an action was brought in bad faith and for the purposes of harassment."  [ECF No. 45 at 4 (citing 15 U.S.C. § 1692k(a)(3))].  Plaintiff's counsel should have realized that the "fee-shifting" provision of the FDCPA is not automatic, as she assumed, but only works if a plaintiff prevails.  Plaintiff could have only prevailed if her case had merit.  Plaintiff's counsel persisted in her demands after she knew or should have known her case was not meritorious.

Plaintiff's counsel also stated to ERC's counsel early in the case "let's get rid of this before year end," [ECF No. 46-1 ¶16], threatened to raise the settlement demand if ERC did not settle before the settlement conference, [ECF No. 46-1 ¶19], and said the day before the settlement conference "Please read page 2 of the settlement conference order. You are supposed to be there WITH AUTHORITY to pay the $5k Let's do it now."  [ECF No. 46-1 ¶23].  Finally, Plaintiff's counsel, in

responding to ERC providing a Connecticut Department of Banking Certification regarding ERC registered "ERC" trade name, asked "why [ERC] continues to fight this." [ECF No. 46-1 ¶27].[6]  In sum, Plaintiff's counsel's communications display an entitlement mentality or at least a firm expectation that ERC should and would simply settle and pay the maximum damages allowed under the statute even though Plaintiff's claim was baseless.  This leads the court to conclude that this case was brought for an improper purpose, to induce ERC to settle rather than to redress wrongs suffered by Plaintiff.  This is a proper basis for the award of sanctions.  *See Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 836 (7th Cir. 2005) ("When [the attorney] demanded $3000 to release a blatantly frivolous [FDCPA] claim, the firm pursued a path that it should have known was improper; therefore, its conduct was 'objectively unreasonable and vexatious.'") (quoting *Kapco Mfg. Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989)).

Plaintiff's other actions also impel the Court toward the imposition of sanctions.  Plaintiff refused to allow ERC's representative and ERC's counsel to attend the settlement conference remotely, instead forcing them to travel from Jacksonville to Hartford in a blizzard.  [ECF No. 7].  Plaintiff never provided a damages analysis to ERC, which was required by Judge Richardson's settlement conference order.  *Id.*  Plaintiff responded to ERC's interrogatories as noted above by referring to ERC as a "scam" and "illegitimate," and an entity "conceal[ing] its

---

[6] Plaintiff's counsel makes much, in several places, of ERC's change to its standard letter in which it added its corporate name in addition to its trade name "ERC." Plaintiff's counsel's fixation on this pint is misplaced, however, as ERC was not required to use its corporate name in the letters and changing the letter to do so admitted nothing in the way of liability pursuant to the FDCPA.

true name." [ECF No. 47 at 7-8]. Plaintiff's counsel sent an undated, improper deposition notice[7] to Richard Landoll for a deposition to occur the day after the settlement conference, in what appears to be a threat to run up litigation costs for ERC. Lastly, Plaintiff amended her complaint and sent numerous communications to add a claim for violation of Conn. Gen. Stat. § 35-1, Connecticut's Fictitious Name Statute, which increased ERC's litigation costs, but later disclaimed doing so, stating:

> The plaintiff has mentioned Connecticut's Fictitious Name statute, Conn. Gen. Stat. § 35-1, only as a possible in-state backup method for identifying 'ERC,' when the Banking Department's list comes up dry, as here. She does not base any claim on violation of state law.

[ECF No. 35 at 17]. That is opposed to Plaintiff's litigating position from the filing of the Amended Complaint until opposing summary judgment. For example, as noted, on December 4, 2017, Plaintiff's counsel sent ERC an email concerning the Parties' Rule 26(f) Report, and asked ERC to stipulate as a material fact that "Defendant has not filed a trade name certificate with any town clerk in Connecticut as required by Conn. Gen. Stat. § 35-1." [ECF No. 46-1 ¶ 14].

As a final point, the Court agrees with ERC that Plaintiff's refusal to admit the simple facts that "ERC" was a trade name "under which it collects consumer debt with the Connecticut Banking Department," that "Defendant has registered

---

[7] The deposition notice was improper because it did not provide reasonable notice to the deponent, given that it was sent only six days before the settlement conference and only seven days before the deposition was to occur. [ECF No. 46-1 ¶ 21 (undated deposition notice received February 28, 2018, six days before settlement conference and seven days before noticed deposition date)]; *Arneauld v. Pentair*, No. CV-11-3891 (SJF) (ETB), 2012 U.S. Dist. LEXIS 168185, at *33-34 (E.D.N.Y. Nov. 26, 2012) (three to five days not reasonable notice for deposition under Federal Rules).

'ERC' as a service mark for 'debt recovery services' with the United States Patent and Trademark Office," and that ERC was "located in Florida," [ECF No. 45 at 19-20], was unreasonable and undoubtedly led to increased litigation costs for ERC. The Federal Rules *require* the Court to impose sanctions for costs associated with Plaintiff's unreasonable denials.  *See* Fed. R. Civ. P. 37(c)(2) (Court "must" order the payment of "reasonable expenses, including attorney's fees, incurred in" proving denied facts, absent exceptions inapplicable here).

As noted by the *Islam* court and others:

It is interesting to contemplate the genesis of these [FDCPA] suits. The hypothetical Mr. Least Sophisticated Consumer ('LSC') makes a $400 purchase.  His debt remains unpaid and undisputed.  He eventually receives a collection letter requesting payment of the debt which he rightfully owes.  Mr. LSC, upon receiving a debt collection letter that contains some minute variation from the statute's requirements, immediately exclaims 'This clearly runs afoul of the FDCPA!' and-rather than simply pay what he owes-repairs to his lawyer's office to vindicate a perceived 'wrong.' . . . Ironically, it appears that it is often the extremely sophisticated consumer who takes advantage of the civil liability scheme defined by [the FDCPA], not the individual who has been threatened or misled.  The cottage industry that has emerged does not bring suits to remedy the 'widespread and serious national problem' of abuse that the Senate observed in adopting the legislation, 1977 U.S.C.C.A.N. 1695, 1696, nor to ferret out collection abuse in the form of 'obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process.'  Rather, the inescapable inference is that the judicially developed standards have enabled a class of professional plaintiffs.

*Islam*, 2017 U.S. Dist. LEXIS 99571, at *7-9 (citing cases) ("Thus far this year in the Eastern District of New York, more than 600 FDCPA cases have been filed not

markedly dissimilar from this one in which damages are sought for some fantasy harm that the statute was plainly not intended to avoid.").

Plaintiff's counsel in this case, JoAnne Faulkner, has run afoul of courts in this district for the same reasons. *See Murphy v. Equifax Check Servs., Inc.*, 35 F. Supp. 2d 200, 204 (D. Conn. 1999) (dismissing case when defendant offered to settle for full amount of damages allowed under FDCPA, but Attorney Faulkner's client had refused to settle, because "[t]he Second Circuit has recognized that when a defendant tenders all that a plaintiff could recover if his or her claim were fully litigated, a justiciable case or controversy no longer exists and the case should be dismissed for lack of subject matter jurisdiction," and noting that "there is nothing in the Act suggesting that it was intended to create a cottage industry for the production of attorney's fees.")[8] (citing *Abrams v. Interco, Inc.*, 719 F.2d 23 (2d Cir. 1983)); *see also Artese v. Academy Collection Serv., Inc.*, No. 3:96-cv-2546 (GLG), 2000 U.S. Dist. LEXIS 1186, at *7-11 (D. Conn. Jan. 18, 2000) (finding plaintiff's claim that defendant's letter stating a mistaken percentage of the amount owed that defendant would accept in satisfaction of the debt meritless and noting that Attorney Faulkner's conduct in the instant case and *Murphy* and others "give[s] rise to a suspicion of barratry and champerty"[9] and merited an award of

---

[8] The alleged FDCPA violation in *Murphy* is unknown, but Defendant Equifax, despite disputing that it violated the FDCPA, wanted to settle because "the costs of litigation would far exceed the maximum statutory damages that plaintiff could recover." 35 F. Supp. 2d at 201.

[9] Black's Law Dictionary defines barratry as "[v]exatious incitement to litigation, esp. by soliciting potential legal clients. Barratry is a crime in most jurisdictions." Black's Law Dictionary 64 (3d Pocket ed. 2006); Champerty is "[a]n agreement between an officious intermeddler in a lawsuit and a litigant by which the

attorneys' fees against Plaintiff); *Remington v. Fin. Recovery Servs., Inc.*, No. 3:16-cv-865 (JAM), 2017 U.S. Dist. LEXIS 36637, at *6, 11 (D. Conn. Mar. 15, 2017) (dismissing Plaintiff's Complaint due to it not alleging, as here, that Defendant's collection letter made any "false, deceptive, or misleading representation"[10] and finding Plaintiff, represented by Attorney Faulkner, to have interpreted Defendant's collection letter, as here, in a "bizarre [and] idiosyncratic" manner); *Johnson v. NCB Collection Servs.*, 799 F. Supp. 1298, 1307 (D. Conn. 1992) (granting summary judgment to defendant and denying plaintiff's motion to reconsider, finding plaintiff's arguments regarding defendant's allegedly deceptive practices[11] "without merit," that plaintiff, as here, "misinterprets the [FDCPA]," and that plaintiff's cited case, as here, was "neither controlling nor persuasive."); *Tzanetis v. Weinstein & Riley, P.S.*, No. 3:09-cv-00413 (DJS), 2010 U.S. Dist. LEXIS 115689 (D. Conn. Nov. 1, 2010) (granting defendant summary judgment where, as here, there were no "false, deceptive, or misleading representation[s] in violation of § 1692e.").[12] It is clear that once she shifted from requesting $5,000 to settle to $1,000

---

intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment." *Id.* at 95.

[10] The *Remington* Defendant's statement in its letter that settlement of the debt "may have tax consequences" did not violate the FDCPA because it was "an accurate statement of the law." 2017 U.S. Dist. LEXIS 36637, at * 7-8.

[11] The allegedly deceptive practices complained of involved the use of the term "Revenue Department" in the return address of the collection letter, and the use of an employee's alias in the collection letter, neither of which were deceptive within the meaning of the FDCPA. 799 F. Supp. at 1307.

[12] The *Tzanetis* Defendant's allegedly deceptive statements concerned possible legal action if prompt resolution of the debt did not occur and possible increases in interest and other costs if resolution was delayed, which were held not deceptive. 2010 U.S. Dist. LEXIS 115689, at *8-13.

plus attorneys' fees, Attorney Faulkner was interested in increasing the amount Plaintiff would receive, not for the Plaintiff, but for her.

As the Court held in ruling on summary judgment, "[t]he FDCPA protects consumers from unscrupulous debt collectors; the statute does not create an avenue to harass legitimate creditors with litigation through superficial interpretation of its provisions."  [ECF No. 42 at 11-12].

In sum, Plaintiff and Plaintiff's counsel's behavior during this litigation, in combination with the baselessness of Plaintiff's claim, leads the Court to award ERC its attorneys' fees and costs in defending this action pursuant to the Court's inherent power and 15 U.S.C. § 1692k(a)(3), because this action was brought in bad faith and for the purpose of harassment.

## VI.   Fee Award Amount

A reasonable attorney's fee is determined by "setting a reasonable hourly rate, taking account of all case-specific factors."  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 188 (2d Cir. 2007).   A presumptively reasonable attorney's fee is the product of a reasonable hourly rate and the number of hours expended.  *Id.*  In adjusting the presumptively reasonable fee, the Court considers an attorney's experience, reputation, and ability; the time, labor and skill required; the novelty and complexity of legal issues posed; and awards in similar cases, among other factors.  *Id.* at 186 n.3.[13]  A court may also

---

[13] "In 2010, the Supreme Court revisited the issue of attorneys' fees and approved of the 'lodestar' approach over the more discretionary approach of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)." *Sevilla v. Nekasa Inc.*, No. 16 Civ. 2368 (AJP), 2017 U.S. Dist. LEXIS 47744, at *5-7 (S.D.N.Y. Mar. 30, 2017) (citing *Perdue v. Kenny A.*, 559 U.S. 542, 551-53 (2010), and

32

look to counsel's performance in the instant matter when assessing a reasonable rate. *Garcia v. Law Offices of Howard Lee Schiff, P.C.*, No. 3:16-cv-791 (VAB), 2019 U.S. Dist. LEXIS 190535, at *8 (D. Conn. Nov. 4, 2019) (citing *Rivera v. Corp. Receivables, Inc.*, 540 F. Supp. 2d 329, 339 (D. Conn. 2008)).

Here, ERC provided affidavits of its counsel of record concerning fees billed, with billing records and a record of costs attached.

Plaintiff attacks the affidavit and billing records on numerous fronts. Rather than recount the details of each argument here, the Court pauses to note that it looks with disfavor on Plaintiff's "shotgun" approach, which entails arguing that ERC's papers outlining its costs are deficient in no less than 11 different ways. The Court elects to discuss Plaintiff's two most important avenues of attack, namely, that ERC's time records for the amounts billed are inadequate, and that hours billed by attorneys at ERC's counsel's office in Jacksonville, Florida are not compensable. Neither argument has merit.

First, Plaintiff claims that "Defendant has not submitted for each attorney, the date, the hours expended, and the nature of the work done . . . [t]here is no breakdown, by attorney or paralegal, of [hours worked]. For instance, other than by painstakingly parsing the ten pages of billing records, one cannot ascertain the time spent by paralegals, or by attorneys who were not admitted in Connecticut state or federal courts." [ECF No. 47 at 18 (citation omitted)]. This argument is

---

"[a]lthough the Supreme Court's *Perdue* opinion appeared to cast doubt on the viability of the Second Circuit's 2008 opinion in *Arbor Hill*, which relied on, among other factors, the *Johnson* factors, *Arbor Hill* remains the standard in this Circuit." *Id.* at *7 n.6.

meritless on its face, as Plaintiff simultaneously faults ERC for not submitting "for each attorney, the date, the hours expended, and the nature of the work done," *id.*, while chastising ERC for submitting billing records that are too detailed.  Plaintiff cannot have it both ways.  The Court agrees with ERC that "[t]he records submitted show, for each individual entry, the task performed, the attorney or paralegal performing the task, and the hours/amount incurred for such tasks," [ECF No. 48 at 8], and that these records were sufficient for the Court to determine their adequacy.

Second, Plaintiff claims that ERC should not be able to claim hours billed by attorneys and paralegals in its Florida office, relying on *Gilmore v. Elmwood S., LLC*, No. Civ. 13-37, 2015 WL 1245770, at *3 (E.D. La. Mar. 18, 2015).  The Court disagrees.  ERC argues that the case *Gilmore* relied on, *Shapiro v. Paradise Valley Unified School District No. 69*, 374 F.3d 857, 862 (9th Cir. 2004), was "already abrogated" by the Ninth Circuit.  That is not quite right.  The *Gilmore* court noted an apparent circuit split, with the Ninth Circuit allegedly on the side of courts that do not allow attorneys' fees unless an attorney is admitted *pro hac vice* in a matter, *Gilmore*, 2015 WL 1245770, at *3, (citing *Shapiro*, 374 F.3d at 862), and with the Fourth Circuit authorizing attorneys' fees whether admitted *pro hac vice* or not.  *Id.* (citing *Priestly v. Astrue*, 651 F.3d 410, 416 (4th Cir. 2011)).  *Gilmore* then sided, as Plaintiff correctly points out, with the Ninth Circuit, and refused to allow attorneys' fees to an attorney not admitted *pro hac vice*.  *Id.*

The problem is that *Shapiro* refused to award attorneys' fees that were incurred in state administrative proceedings, which were governed by state law,

which required *pro hac vice* admission, where an attorney argued a case that was later appealed to the district court.   But as ERC argues, the Ninth Circuit in *Winterrowd v. American General Annuity Insurance Co.* held, five years after *Shapiro*, that proceedings in federal court are governed by federal statute and rule, not state, and that those statutes and rules generally allow the award of attorneys' fees for remote attorneys and paralegals.   556 F.3d 815, 822-25 (9th Cir. 2009). *Winterrowd* did not abrogate *Shapiro*, it simply cabined it to state proceedings. *Santiago v. Equable Ascent Fin.*, No. C 11-3158 CRB, 2013 WL 3498079, at *5 n.4 (N.D. Cal. July 12, 2013) ("Equable argues that fees for this work are not recoverable under *Shapiro v. Paradise Valley School Dist. No. 69,* 374 F.3d 857, 861–62 (9th Cir. 2004).   However, *Shapiro* dealt with attorneys' fees related to work in state administrative proceedings . . . , whereas *Winterrowd* explained that fees related to work done in federal district court turn on district court rules and federal law.   556 F.3d at 822.").

Moreover, *Winterrowd* explained that at the time it issued, in February 2009, "[t]he leading circuit court case on this issue [was] *Spanos v. Skouras*, 364 F.2d 161, 168 (2d Cir. 1966) (*en banc*)," [which] permitted an out-of-state attorney to receive fees for work related to a case in federal court when it was certain he would have been admitted *pro hac vice* as a matter of course.   *Winterrowd*, 556 F.3d at 822-23.   *Spanos'* holding was reaffirmed as recently as February of last year. *Pappas v. Phillip Morris, Inc.*, 915 F.3d 889, 896 (2d Cir. 2019) ("[I]t is within the power of the federal government to determine who will be permitted to practice in its courts and that this includes allowing compensation for services rendered in

35

regard to litigation in the federal courts.") (quoting *Spanos*, 364 F.2d at 165). Therefore, it is well-settled, at least in this Circuit, that attorneys' fees are recoverable whether or not an attorney is admitted to this Court.  Moreover, as *Winterrowd* noted, "court[s] ha[ve] permitted fee recovery for the work of paralegals, database managers, legal support, summer associates, and even attorneys who have yet to pass the bar [because t]hey are . . . an integral part of the litigation process."  556 F.3d at 823 (citing *Nat'l Res. Def. Council, Inc. v. Winter*, 543 F.3d 1152 (9th Cir. 2008)).

The Court finds that ERC's suggested rates are reasonable.  First, Attorney Scott Gallagher's rate of $394.41 per hour is reasonable based on his exemplary service as lead counsel in this matter, his 20 years of legal experience, his litigation of hundreds of FDCPA cases, his litigation experience in more than 12 states and his admission to 15 separate federal and state courts.  Courts in this district have awarded attorneys' fees in FDCPA cases at between $325 and $400 per hour for experienced litigators. *Garcia*, 2019 U.S. Dist. LEXIS, at *7-8.  The rates for the other legal professionals on Attorney Gallagher's team are also reasonable.

The Court also finds that the hours billed are reasonable.  First, none of the entries are for clerical or non-legal work.  *Id.* at *11-12.   Second, Attorney Gallagher's senior associate Richard Rivera drafted ERC's Motion for Summary Judgment, which was appropriate, and Attorney Gallagher's junior associate, Nicole Kalkines, drafted the summary judgment Reply Brief, which was also appropriate.  The Court also notes that many of the entries exist because of Plaintiff's litigation tactics; for example, including reference to Conn. Gen. Stat. §

36

35-1 in the Amended Complaint and in correspondence with ERC's counsel required ERC to spend hours researching Connecticut statutes and their application by the courts.  The same is true of Plaintiff's opposition to ERC's entirely proper affidavits and exhibits in support of summary judgment, which spawned unnecessary litigation regarding judicial notice and increased ERC's counsels' hours.

The Court also finds that ERC's bill of costs is reasonable.  The legal research vendor costs were incurred by associates Rivera and Kalkines, and paralegal Amy Nicotra, and correspond to dates in the billing records where research occurred.  Secretarial charges are appropriately zeroed out.  Other charges for PACER and Attorney Gallagher's $75 *pro hac vice* fee are allowable. Finally, hours billed, and costs associated with Attorney Gallagher's attendance at the settlement conference are reasonable, especially in the fact of Plaintiff's refusal to allow him to attend remotely.

VII.   <u>Conclusion</u>

The Court finds that attorneys' fees are properly awarded to ERC in this case. ERC's hours billed charge was $40,213.62 and its costs were $1,658.33, both of which were, as noted, proper.  Therefore, the Court awards ERC attorneys' fees and costs in the total amount of $41,871.95.

IT IS SO ORDERED.

_____*/s/*_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: March 10, 2020

37